THOMAS, Judge.
A.C. (“the mother”) appeals from the judgment of the Houston Juvenile Court declaring L.C. (“the child”) dependent and placing custody of the child with C.C. (“the grandmother”). This is the second time this case has come before this court. In A.C. v. C.C., 34 So.3d 1281 (Ala.Civ.App.2009), we dismissed the mother’s appeal, holding that the juvenile court’s judgment was not final because the juvenile court had not addressed several outstanding contempt motions. A.C., 34 So.3d at 1287. The juvenile court subsequently denied any outstanding contempt motions, and the mother again appealed the juvenile court’s judgment to this court.
The facts and procedural history of this case were explained in A.C. as follows:
“At the time of the child’s birth in 2003, the mother was 18 years old. The mother, the grandmother, and D.C., the child’s maternal grandfather (from whom the grandmother was later divorced) were all residents of Louisiana. When the child was 11 months old, the mother voluntarily relinquished custody of the child to the grandmother. On August 3, 2004, the District Court of Livingston Parish, Louisiana, awarded custody of the child to the grandmother for a three-year period ending August 1, 2007. Soon after the Louisiana court entered that judgment, the mother left Louisiana. In May 2006, the grandmother and the child moved to Dothan, Alabama.
“On April 26, 2007, the grandmother filed in the Houston Juvenile Court a petition alleging that she had had legal custody of the child since August 3, 2004, pursuant to a Louisiana judgment, a copy of which she attached to her petition. The grandmother further alleged that the mother was aware that, under the terms of that judgment, the grandmother’s custody rights were due to expire on August 1, 2007, and that the mother might ‘have plans to attempt to take the child at that time’; that the mother was unstable and unfit to have custody of the child because she had a history of drug abuse; that the mother had not seen the child since January 5, 2006, had not telephoned the child since April 21, 2007, and had not provided support for the child; that the mother was currently a resident of Alaska; that the whereabouts of the man believed to be the child’s biological father were unknown; and that it was in the child’s best interest to remain in the custody of the grandmother. On the day the petition was filed, the juvenile court entered an order awarding the grandmother pendente lite custody of the child.
“On June 28, 2007, the mother answered the grandmother’s petition, filed a counterpetition for custody of the child, and requested that the court order a home study of her residence in Alaska. The mother acknowledged that she had voluntarily relinquished custody of the child in 2004; she asserted that she and *728 the grandmother had agreed that the child would be in the grandmother’s temporary custody for three years so that the mother ‘could become drug free and stable in her life.’ The mother further alleged that she had ‘cleaned up her life, [was] gainfully employed working four jobs, [had] a stable home, and [was] ready, willing, and able to abide by the agreement she made three years ago’; that her alleged failure to have kept in touch with the child was due to the grandmother’s denial of contact and the great distance between Alabama and Alaska; and that the grandmother’s assertions as to the mother’s unfitness were based upon ‘events that led up to the August 3, 2004 agreement and are not otherwise supported by any factual basis.’ On July 24, 2007, the juvenile court entered an order continuing pen-dente lite custody with the grandmother, directing the Houston County Department of Human Resources (‘DHR’), via its counterpart in Alaska, to conduct a home study of the mother’s residence, and allowing the mother biweekly telephone contact and supervised visitation with the child.
“In December 2007, the mother and her younger daughter, M.J., who had been born in October 2006, moved to Dothan so that the mother could attempt to establish a relationship with the child. The mother secured a job as an apprentice electrician at the Farley Nuclear Power Plant and began work in January 2008. She obtained an apartment in Dothan and made day-care arrangements for her younger daughter, M.J. The mother and the grandmother had disagreements over the amount and type of visitation that the mother should have with the child, and, on January 24, 2008, the juvenile court ordered specific times for the mother’s visitation with the child, stating that the parties were entering ‘a transitional phase toward reunification’ of the mother with the child. The court directed that the visits be supervised by Dr. Lynn Suggs, a licensed professional counselor.
“On February 8, 2008, the mother filed a contempt motion, alleging that the grandmother had refused to allow the mother to visit the child with Dr. Suggs present. The juvenile court entered an order on February 14, 2008, continuing a hearing on the contempt motion to March 27, 2008.
“On February 21, 2008, the grandmother moved to strike the mother’s contempt motion and moved the court to order that the mother have an independent psychological evaluation. On March 4, 2008, the mother filed an objection to the grandmother’s motion that she have a psychological evaluation, asserting that the parties had agreed to carry out a reunification plan and that the grandmother was reneging on the agreement, because, the mother alleged, all the grounds listed in the grandmother’s motion predated the parties’ agreement to work towards reunification. On March 27, 2008, the juvenile court ordered both the mother and the grandmother to undergo psychological evaluations. The court did not rule on the mother’s February 8, 2008, contempt motion.
“On April 17, 2008, the juvenile court granted the mother weekend daytime visitation rights. On April 23, 2008, the grandmother moved the court to issue a temporary restraining order to prevent the mother from taking the child out of State. On May 6, 2008, the mother moved for overnight visitation, attaching to her motion a copy of her psychological evaluation conducted by a clinical psychologist, Dr. Melanie Cotter. On May 8, 2008, the juvenile court referee *729 ordered the mother not to remove the child from the jurisdiction of the court pending further orders, and the referee set a hearing on all other pending motions for June 26, 2008. On May 16, 2008, the grandmother objected to the mother’s having overnight visitation with the child, alleging that the child’s safety was at risk because the mother had previously accused her father, D.C., of sexual abuse, and yet had allowed D.C. to visit her and to stay overnight in her home since she had moved to Dothan. On June 3, 2008, the grandmother moved the court to hold the mother in contempt for taking the child out of state to Dr. Suggs’s home in Georgia. On June 4, 2008, the mother moved the court to hold the grandmother in contempt for denying her visitation with the child. Following a hearing on June 26, 2008, the juvenile court granted the mother overnight visitation with the child on alternating weekends and ordered that the child have no contact with D.C. The record does not indicate that the court ruled on any of the three pending contempt motions.
“On July 8, 2008, D.C., who was still a resident of Louisiana, moved to intervene, seeking grandparent visitation with the child. The same day, the grandmother moved the court to order the mother to pay child support pursuant to Rule 32, Ala. R. Jud. Admin. On September 12, 2008, the mother filed a second petition for custody of the child and moved the court to consolidate a hearing on her petition with the hearing on the grandmother’s request for child support.
“On September 29, 2008, the mother moved for an emergency hearing on her custody petition, asserting that the grandmother’s ‘bizarre and delusional’ behavior had put the child at risk of serious injury. The mother alleged, among other things, that the grandmother had participated with K.C., the child’s maternal aunt, in distributing an ‘Amber Alert’ e-mail message, falsely reporting that the mother’s younger daughter, M.J., had been abused and neglected and was missing. The mother also alleged that the grandmother had falsely reported to DHR that the child had been sexually abused by the mother and D.C. Following a hearing on September 30, 2008, the juvenile court ordered DHR to report to the court its finding with respect to the sexual-abuse complaint. It also ruled that the mother’s overnight weekend visitation would continue pending further orders of the court. On October 1, 2008, the grandmother petitioned for custody of M.J., asserting that M.J. was dependent. On October 3, 2008, the mother left Dothan, rented a mobile home near D.C.’s home in Louisiana, and filed a custody petition in a Louisiana court, seeking legal custody of M.J.”[1]
34 So.3d at 1282-1284 (footnote omitted).
On March 24, 2009, the juvenile court entered a judgment declaring the child dependent, awarding the grandmother custody of the child, and awarding the mother visitation. The juvenile court made the following findings of fact and conclusions of law in its judgment:
“[The mother] voluntarily relinquished custody of [the child] to [the grandmother] on August 3, 2004, in the State of Louisiana. [The child] was approximately eleven months old at this time. This transfer of custody was approved *730 by the Louisiana court, which ordered that [the grandmother] would retain custody of [the child] for a period of three years. [The child] has since resided with [the grandmother] for over five years.
“The evidence at trial established that the primary reason for the transfer of [the child’s] custody from [the mother] to [the grandmother] was [the mother’s] drug use and lack of stability. Subsequent to relinquishing custody of [the child], [the mother left Louisiana and] traveled to various states and for approximately one year — most of 2006— [the mother’s] whereabouts were unknown. During the three years following the Louisiana order, [the mother] had little contact with [the child] and provided no support on her behalf.
“At trial, [the mother] attempted to prove that she had attained a stable lifestyle and that she is no longer using drugs, as evidenced by negative drug screens for the past two and one-half years. She testified that she moved to Dothan and worked for some time here as an electrician’s apprentice, earning $11.38 per hour at the nuclear plant. However, by the time of the hearing, she had moved to Louisiana to get better work and to be near her father. [The mother] presented testimony from a [Houston County Department of Human Resources] social worker who testified that she had no concerns with [the child’s] custody being returned to [the mother]. [The mother] also called as a witness Dr. Lynn Suggs, a licensed professional counselor, who testified as to [the mother’s] efforts to establish a relationship with [the child].
“[The grandmother] disputed and discounted [the mother’s] attempts to rehabilitate herself and testified that [the mother] had not successfully established a mother-daughter relationship with [the child]. [The grandmother] also presented the testimony of Dr. David Ghostley, a psychologist who had evaluated [the mother and the child]. Dr. Ghostley testified that the results of [the mother’s] MMPI [Minnesota Multiphasic Personality Inventory] were not valid due to an elevation on the ‘lie scale,’ a built-in mechanism within the MMPI used to determine whether persons taking that inventory are providing truthful responses. Dr. Ghostley also testified that it would not be in [the child’s] best interests to be removed from the custody of [the grandmother] at this time. [The grandmother] also questioned the credibility of the testimony presented by Dr. Suggs and attempted to show by cross-examination of Dr. Suggs that [the mother] and Dr. Suggs had developed a personal relationship, as demonstrated in part by the fact that Dr. Suggs and her husband had traveled to Alaska, at [the mother’s] expense, when Dr. Suggs first met [the mother] to assist her in this case.
“During the course of the trial, [the child’s] father also testified. Due to his extremely limited contact with [the child] and his failure to show interest in maintaining a relationship with [the child], the court finds that he is not a suitable person to have custody of [the child] and that there is no reason to believe that he is able or willing to support or nurture [the child] or provide for her welfare at this time.
“... [The child’s] case presents serious and difficult issues. On one hand, [the mother] has made efforts at rehabilitation and has demonstrated an interest in parenting [the child]. On the other hand, the court cannot turn a blind eye to the tragic facts and circumstances— for which [the mother] is responsible— which have created the difficulties in *731 volving [the child’s] custody. Ultimately, the issue this court must address is whether the relatively recent emergence of [the mother] as an interested parent is sufficient to prevent a finding of dependency. Upon consideration of the evidence and testimony in this case, the court decides this issue adversely to [the mother] and does find by clear and convincing evidence that [the child] is a dependent child.”
The mother first argues that the juvenile court lacked subject-matter jurisdiction over the case, because, the mother argues, the grandmother’s petition was a petition seeking custody, not a petition alleging dependency, and, as such, it was insufficient to invoke the jurisdiction of the juvenile court. We agree. “We review de novo whether the trial court had subject-matter jurisdiction.” Solomon v. Liberty Nat'l Life Ins. Co., 953 So.2d 1211, 1218 (Ala.2006). Alabama Code 1975, former § 12-15-30(a),[2] provided that “[t]he juvenile court shall exercise exclusive original jurisdiction of proceedings in which a child is alleged to be delinquent, dependent or in need of supervision.” Alabama Code 1975, former § 12-15-1(10),[3] defined a dependent child as a child:
“a. Who, for any reason is destitute, homeless, or dependent on the public for support; or
“b. Who is without a parent or guardian able to provide for the child’s support, training, or education; or
“c. Whose custody is the subject of controversy; or
“d. Whose home, by reason of neglect, cruelty, or depravity on the part of the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
“e. Whose parent, parents, guardian, or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical, or other care necessary for the child’s health or well-being; or
“f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
“g. Who has no proper parental care or guardianship; or
“h. Whose parent, parents, guardian, or custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state; or
“i. Who has been abandoned by the child’s parents, guardian, or other custodian; or
“j. Who is physically, mentally, or emotionally abused by the child’s parents, guardian, or other custodian or who is without proper parental care and control necessary for the child’s well-being because of the faults or habits of the child’s parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
“k. Whose parents, guardian, or other custodian are unable to discharge *732 their responsibilities to and for the child; or
“l. Who has been placed for care or adoption in violation of the law; or
“m. Who for any other cause is in need of the care and protection of the state; and
“n. In any of the foregoing, is in need of care or supervision.”
In order for a child to be declared dependent, the juvenile court must find that one of the alternative bases listed in subsections a. through m. of former § 12-15-1(10) exists and that the condition in subsection n. that the child “is in need of care or supervision” has been met. J.W. v. N.K.M., 999 So.2d 526, 532 (Ala.Civ.App.2008).
The grandmother’s petition was submitted along with a preprinted form supplied by the juvenile court. The grandmother checked a box on the preprinted form indicating that the child was dependent. In her petition, titled as a “petition for custody,” the grandmother alleged that “the minor child has resided in [the grandmother’s home] since March of 2004, and [that the grandmother] has had legal custody of [the child] since August 3, 2004. Said custody was granted in the 21st Judicial District Court of the Parish of Livingston, State of Louisiana.” The grandmother also alleged that the Louisiana custody order would expire on August 1, 2007, that the grandmother believed that the mother would attempt to regain custody of the child at that time, and that the mother was unfit to have custody of the child. The grandmother further alleged in her petition that, “[d]ue to the mother’s unstable history and her complete lack of contact and support for the [child,] the [grandmother] believes it would be in the child’s best interest to remain in the custody of the [grandmother].” The grandmother then requested that the juvenile court award the grandmother temporary and permanent legal custody of the child.
In J.W. v. N.K.M., 999 So.2d 526 (Ala.Civ.App.2008), and T.T.T. v. R.H., 999 So.2d 544 (Ala.Civ.App.2008), this court considered whether a juvenile court has subject-matter jurisdiction over a dependency petition when a mother has left a child in the care of relatives and has little subsequent contact with the child. In both J.W. and T.T.T., this court held that the juvenile court had subject-matter jurisdiction over the petition. This case, however, can be distinguished from both of those cases.
In J.W., the child’s great-aunt filed a dependency petition, alleging that the child’s mother had left the child in the care of relatives for most of the child’s life and that the child had lived with the great-aunt for the past year. J.W., 999 So.2d at 527. The great-aunt alleged in an amended complaint that the mother had abandoned the child. Id. In holding that the juvenile court had subject-matter jurisdiction oyer the great-aunt’s petition, we noted that in that case there had been no transfer of legal custody of the child pursuant to a court order to the great-aunt or another relative; the great-aunt had only physical custody of the child. Id. at 535. We went on to conclude that the great-aunt’s allegations that the mother had simply left the child in the care of relatives, that the mother had visited the child infrequently, and that the mother had failed to provide financial support for the child were sufficient to invoke the dependancy jurisdiction of the juvenile court because the allegations, if proven to be true, would support a finding that the child was without a parent or guardian able to provide support for the child. Id.
In T.T.T., the mother of the child had been awarded sole custody of the child when the mother and the father divorced. *733 T.T.T., 999 So.2d at 546. The mother subsequently died. Id. The maternal grandparents filed a dependency petition in the Baldwin Juvenile Court, alleging that the mother had left the child in the care of the maternal grandparents for several years and that the child “was dependent and in need of care and supervision because the child had no parent or guardian able to provide for her support.” Id. As in J.W., the maternal grandparents in T.T.T. did not have legal custody of the child pursuant to a court order; the maternal grandparents had only physical custody of the child. Id. Thus, the child did not have a legal guardian or custodian. This court held that the maternal grandparents’ allegations were sufficient to invoke the dependency jurisdiction of the juvenile court because the allegations of the maternal grandparents, if proven to be true, would show that the child was dependent. Id. at 548.
In both J.W. and T.T.T., the petitioning party was not the legal custodian of the child, even though the petitioning party in each case had physical custody of the child. In this case, unlike the petitioners in J.W. and T.T.T., the grandmother has had more than just physical custody of the child. The grandmother, pursuant to a court order, had legal custody of the child from 2004 through the time the grandmother filed her petition. This fact negates any implication that might be gleaned from the other allegations in the grandmother’s petition that the child is in need of additional care or supervision. See Ala.Code 1975, former § 12-15-52(c)(l) (providing that a petition for dependency must set forth with specificity “[t]he facts which bring the child within the jurisdiction of the court, the facts constituting the dependency, delinquency or need of supervision and that the child is in need of supervision, treatment, rehabilitation, care or the protection of the state, as the case may be”).
Additionally, although the grandmother’s petition contains allegations concerning the mother that, if proven to be true, would show that the mother was unfit or incapable or caring for the child, the grandmother’s allegation that the child has, at all times, been in the legal custody of the grandmother, pursuant to a court order, would preclude a finding by the juvenile court that the child is “without a parent or guardian able to provide for the child’s support, training, or education.” Former § 12 — 15—l(10)(b). There are also no allegations in the grandmother’s petition that would support a finding of dependency based on any of the other grounds listed in former § 12-15-1(10), and the evidence at trial did not establish that the child has been without proper care and supervision during the time the grandmother has had legal custody of the child or that the child is in need of care and supervision beyond that already being provided by the grandmother.
This case is, in essence, a custody dispute between the grandmother, who currently has custody of the child and who wishes to retain custody of the child, and the mother, who wishes to gain custody of the child. As such, the circuit court was the proper court in which to file the petition. The circuit court could have then determined which party should have custody of the child under Ex parte Terry, 494 So.2d 628 (Ala.1986).
Because of the grandmother’s status as the legal custodian of the child, the facts alleged in the grandmother’s petition could not support a finding that the child was dependent, and, thus, the allegations in the grandmother’s petition were insufficient to invoke the subject-matter jurisdiction of *734 the juvenile court.[4] Therefore, we dismiss the mother’s appeal with instructions for the juvenile court to vacate its judgment. Riley v. Pate, 3 So.3d 885, 838 (Ala.2008).
APPEAL DISMISSED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN and MOORE, JJ., concur in the result, -without writings.

. The juvenile court determined that M.J. was not dependent and that M.J. was in the custody of his father, who was providing proper care for M.J. No issue with respect to the alleged custody or dependency of M.J. is presented in this appeal.

. By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, amended and renumbered the statutes governing juvenile proceedings, previously codified at Ala.Code 1975, § 12-15-1 et seq., and enacted the Alabama Juvenile Justice Act ("AJJA”), codified at Ala.Code 1975, § 12-15-101 et seq. The effective date of the AJJA is January 1, 2009. Because the grandmother's petition was filed before the effective date of the AJJA, the AJJA does not apply to this case.

. See supra note 2.

. Because we determine that the juvenile court did not have subject-matter jurisdiction over the grandmother’s petition, we pretermit discussion of the remaining issues in the mother's appeal.